D4idokls

Sentence

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          12 Cr. 177 (WHP)

 5   ALI OKLU,

 6              Defendant.

 7   ------------------------------x

 8
                                           April 18, 2013
 9                                         11:10 a.m.

10
     Before:
11
                     HON. WILLIAM H. PAULEY III,
12
                                           District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  CARRIE COHEN
17        Assistant United States Attorney

18   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorneys for Defendant
19   BY:  PHILIP WEINSTEIN

20           - also present -

21   SA Kenneth Hosey, FBI

22

23

24

25
```

D4idokls

Sentence

1          THE CLERK:  The case of United States of America

2    against Ali Oklu.

3          Appearances for the government?

4          MS. COHEN:  Good morning, your Honor.  Carrie Cohen

5    for the government.  With me at counsel table is Special Agent

6    Kenneth Hosey from the Federal Bureau of Investigation.

7          THE COURT:  Good morning, Ms. Cohen.

8          THE CLERK:  Appearances for the defendant?

9          MR. WEINSTEIN:  Phil Weinstein.  With me is Mr. Oklu.

10         THE COURT:  Good morning, Mr. Weinstein.

11         And I note Mr. Oklu's presence at counsel table.

12         This is a continuation of the sentencing proceeding

13   that we began last week.

14         Are the parties ready to proceed?

15         MR. WEINSTEIN:  Yes, your Honor.

16         MS. COHEN:  Yes, your Honor.

17         THE COURT:  All right.  Let me say first that I

18   received a communication from Pretrial Services indicating

19   that, as I had directed them last week to test Mr. Oklu on

20   Monday, that in fact Mr. Oklu was tested and that the results

21   were negative, and so this Court is prepared to proceed to

22   sentencing.

23         Mr. Weinstein, have you reviewed with your client the

24   presentence investigation report?

25         MR. WEINSTEIN:  I have, your Honor.

D4idokls
Sentence

1    THE COURT:  Are there any factual matters set forth in

2    the report that you believe warrant modification or correction?

3    MR. WEINSTEIN:  Not consequential.  At one point in

4    the report there is a reference to his parents returning to

5    Turkey.

6    THE COURT:  Yes.

7    MR. WEINSTEIN:  That is incorrect.  They are remaining

8    here in the United States.

9    THE COURT:  All right.

10   MR. WEINSTEIN:  So I --

11   THE COURT:  Well, let's find that paragraph.

12   MR. WEINSTEIN:  OK.  It is 122, the last sentence.

13   THE COURT:  All right.  I am going to strike that last

14   sentence.  I'm physically striking it.

15   Anything else?

16   MR. WEINSTEIN:  Not in the presentence report.

17   THE COURT:  All right.  Ms. Cohen, are there any

18   factual matters set forth in the report that the government

19   believes warrant modification or correction?

20   MS. COHEN:  No, your Honor.  I just wanted to correct

21   something that the government represented to the Court at the

22   last sentencing hearing regarding the type of vehicle that the

23   defendant currently has on lease, and we stated that we believe

24   it is a BMW.  I stand corrected.  It is a 2011 Mercedes-Benz

25   350 Series convertible.  It doesn't appear in the report.  It's

D4idokls

Sentence

1    just I wanted to correct my representation on the record.

2              THE COURT:  All right.  Thank you.

3              Do you wish to be heard, Mr. Weinstein?

4              MR. WEINSTEIN:  Yes, your Honor.

5              First, let me attempt to clear up a few things.

6              Last, I guess, Thursday the Court was disturbed, and

7    for perhaps seemingly good reason, about Mr. Oklu's inability

8    to void for a test.  I have doctors' letters.  This condition

9    has come long before this happened, where he was examined for

10   renal failure and the rest.  So -- may I hand it up?

11             (Pause)

12             THE COURT:  All right.  Thank you.  I have reviewed

13   the letter from Dr. Escobar.

14             MR. WEINSTEIN:  Thank you, your Honor.

15             Second, the Court expressed some concern about

16   Mr. Oklu's income and failure to hire an attorney and also the

17   car.  So he did solicit right after I got the case three

18   attorneys, each of whom quoted him $50,000 up front, plus more

19   if the case went to trial.  I am happy to give the Court the

20   names of the attorneys.  I have the names and phone numbers.

21             THE COURT:  That is not necessary.

22             MR. WEINSTEIN:  OK.  Second, with respect to the car,

23   it was a lease that was entered into prior to his arrest.

24   Under the terms of the lease -- and I've confirmed this with

25   people in our office who lease cars, I don't have a car -- you

D4idokls

Sentence

```
 1    are responsible for the full payment if you cancel within the

 2    term of the lease unless it can be subleased.  So the monthly

 3    payment that was due for the cars would continue, and that

 4    would be another part of his debt.

 5              In addition, I think --

 6              THE COURT:  Has he been making payments on his

 7    Mercedes convertible?

 8              MR. WEINSTEIN:  Not since -- he has now lost his job,

 9    obviously, when he pled guilty.  He resigned --

10              THE COURT:  That was back in December?

11              MR. WEINSTEIN:  Back in December.  Up 'til that point

12    you were making payments?

13              (Mr. Weinstein conferred with the defendant)

14              MR. WEINSTEIN:  Yes.  Up until the point he lost his

15    job at the Police Department he was making payments.  He was

16    working for the Police Department.  He lives in Queens and his

17    precinct -- I'm sorry.

18              He lives in Queens and he was working in Manhattan.

19    He was --

20              THE COURT:  He lives with his parents.

21              MR. WEINSTEIN:  Yes, that is correct.  And that is

22    reflected -- he helps with the rent, which I think is reflected

23    in his expenses, I think $600, $600-some-odd per month.  So he

24    doesn't have overwhelming expenses.  I think his expenses are a

25    little over $3,000 a month, if I recall correctly.
```

D4idokls
Sentence

1            But the point is he has negative equity.  Each of the

2   lawyers wanted $50,000 up front and additional money if the

3   case went to trial.  It is a case that obviously I was involved

4   in and it ended up in a guilty plea, but there were multiple

5   hours of discovery of videotapes that had to be reviewed.  I

6   don't know what these lawyers charge per hour.  I know I put in

7   a lot of hours reviewing the videotapes alone, plus other parts

8   of the work.  So I don't know if that is an appropriate fee or

9   inappropriate fee, that is well beyond something that I do.

10  But he did consult three attorneys recommended by various

11  people in the PBA as knowledgeable in this area.

12            So hopefully that will clear some of that.

13            THE COURT:  Has his car been repossessed?

14            MR. WEINSTEIN:  At the end of this month it will be

15  surrendered.  I mean, he is accumulating whatever he owes on

16  the car; he is not making payments.

17            THE COURT:  Well, he is not making payments on lots of

18  things.

19            MR. WEINSTEIN:  Right.

20            THE COURT:  His student loan debt and everything else

21  that this country did for him, after we made him a U.S.

22  citizen.

23            MR. WEINSTEIN:  Well, he was a U.S. citizen, I think,

24  when he was 8, 9.

25            THE COURT:  Yes.  Like I said, after we made him a

D4idokls
                              Sentence

1   U.S. citizen.

2          MR. WEINSTEIN:  All right.  I mean, he obviously has

3   substantial debt and -- OK.

4          So let me -- at least those are the explanations I

5   have for those factors.

6          THE COURT:  All right.

7          MR. WEINSTEIN:  As the Court knows, there are

8   stipulated guidelines in this case and we are not challenging

9   them.  It is 36 to 46 months.  In the last page of my brief I

10  made a mistake and said 47 months.  It is in fact 46 months.

11  Probation has recommended a top of the guidelines' sentence of

12  46 months.  Their reasoning is that it was egregious for a

13  police officer to transport guns, to abuse trust, and for not,

14  in their view, providing any explanation for his conduct.  And

15  the government adopts that view, not that it necessarily is the

16  top of the guidelines but that a guidelines' sentence is

17  appropriate, and we are not disputing that.

18          The issue is whether the sentence is appropriate, that

19  is, a top-of-the-guidelines' sentence is appropriate in this

20  case.  And the government talks about the wisdom of the

21  guidelines and other studies.  But the foundation of the

22  guidelines, as I understand them, that aside, is to reduce

23  disparity among similarly-situated defendants and among

24  different courts that impose sentences for similar conduct.

25  And there were 11 defendants in this case, there were nine

D4idokls
                            Sentence

1   judges, and it becomes a particularly difficult task,

2   obviously, to balance all of that.  But the sentences in this

3   case have ranged from 57 months for the leader, Mr. Masso, to

4   10 months, effectively a year and a day, which is in effect 10

5   months.

6           THE COURT:  Or 11 months.

7           MR. WEINSTEIN:  Or 11 months, 10-plus months.

8           Five of the defendants, like the defendant, are

9   current or former police officers who were either full-time or

10  ended their department responsibilities at some point.  None

11  obviously have prior records; they couldn't as a police

12  officer.  Five were involved in the transportation of firearms,

13  which I think, at least on a gut level, strikes as the most

14  serious part of it, not that the other isn't but the firearms

15  part is particularly, and yet the sentences were all over the

16  lot.

17          Mr. Masso, who was a leader, recruiter, and did

18  everything, got 57 months, which would be 11 months longer than

19  is recommended for Mr. Oklu.

20          Mr. Venezia, who is an active NYPD, three trips, 24

21  months.

22          Goris, 11 trips, 36 months, and he was the one who

23  recruited Mr. Oklu.  He did not know Masso at the beginning of

24  this.

25          THE COURT:  I'm sorry.  Who?

D4idokls
Sentence

1      MR. WEINSTEIN:  Mr. Goris, G-o-r-i-s.  According to

2  the presentence report, he had done 11 trips.  He was the

3  person who had recruited Mr. Oklu, introduced him to Masso, and

4  he got 36 months from Judge Jones.  And I understand that the

5  Court is not bound by what probably was a guideline error made

6  by Judge Jones in not providing for a defaced serial number

7  enhancement in that case.  Nevertheless, under 3553(a) the

8  Court, disparity is a factor the Court can look at.

9      Mr. Ortiz, who made five trips, got 27 to 33 months.

10      And Trischitta, who the Court sentenced, got 40

11  months.  He made at least six trips.  The government said his

12  guidelines were 33 to 41 months.  At least reading the

13  government's memos in those cases, in fact, it was 37 to 46

14  months, which means he got a mid-level sentence of 40 months.

15      Probation argues in part, and the government accepts,

16  that Mr. Oklu's post-offense conduct, which was exemplary -- or

17  he was a sergeant, he participated in over 20 arrests --

18  somehow makes his conduct worse.  I don't quite understand the

19  logic of that.  That if, in fact -- I mean, I'm not claiming

20  post-offense rehabilitation here, or anything like that, but he

21  did continue to work -- he needed the money -- as a police

22  officer.  He stared at monitors all day and participated in

23  over 20 arrests, according to his sergeant, and was a very good

24  cop.  So it is certainly not an aggravating factor.  I mean,

25  the Court can weigh it as it wants, but it doesn't make his

D4idokls
                             Sentence

1    conduct worse, as Probation argues.

2            So finally, the final part to this is -- and I know

3    this isn't a ground for downward departure, and I'm not asking

4    for it or even a variance, but police officers who do time in

5    prison, it's particularly hard.  They are obviously targets of

6    other inmates for what they do.  If the Court were to remand,

7    as Ms. Cohen had asked the last time, if the Court imposes a

8    jail sentence, if it were to remand him and while he is being

9    designated, the chances are he would be in SHU until he is

10   designated, for his own safety, because especially at MCC and

11   MDC, where it is quite possible he would run into people whose

12   arrests he had participated in and, also, the word would get

13   out that he is a police officer, that would be an additional

14   concern.  I mean, he did what he did and he is going to be

15   punished, and he understands that, but the kind of time he is

16   going to do would be particularly hard.

17           In addition, BOP policy for police officers -- again,

18   as a matter of protection -- is to send them out of the circuit

19   to do their time, so they are further away from family.  One of

20   the officers is in Virginia.  Another is in New Hampshire.

21           Mr. Oklu has very close family.  Two of his sisters

22   are here.  His brother and brother-in-law were here on

23   Thursday.  They can't take another day off from work so they

24   can't come.

25           So this isn't an argument for reduced sentence in the

D4idokls

Sentence

1    sense that below the guidelines.  All I am asking is the Court

2    treat Mr. Oklu in a manner similar to the other officers.  He

3    by no means was the worst.  The Court had had one of the other

4    officers before it previously, Mr. Trischitta.  I would think

5    somewhere in the middle of the guidelines would be much more

6    appropriate for what he did, especially given that Mr. Masso

7    would -- as things now stand, if the Court were to adopt the

8    recommendation of Probation, the difference between the two of

9    them is 11 months, between the leader/organizer and the one who

10   got this whole thing going.

11           So for all of those reasons I would request the Court

12   to sentence him somewhere in the middle of the guidelines and

13   let him voluntarily surrender.  He is certainly not a flight

14   risk, and I think hopefully the Court satisfied that he is not

15   a drug user.

16           THE COURT:  All right.  Thank you, Mr. Weinstein.

17           MR. WEINSTEIN:  Thank you, Judge.

18           THE COURT:  Ms. Cohen, does the government wish to be

19   heard?

20           MS. COHEN:  Yes, your Honor.

21           As the government set forth in our papers, we believe

22   a sentence within the guidelines is appropriate and even a

23   sentence at the top of the guidelines.

24           The fact that this defendant was out making arrests at

25   the same time that he is moving guns onto the streets of New

D4idokls

Sentence

York City I think is particularly egregious and I think should

be considered by the Court in framing an appropriate sentence

in this case.

        This defendant was a core member of this conspiracy.

He was a particularly active member.  A guidelines' sentence

here is commensurate with sentences received by other

defendants and their relative culpability.

        He participated in multiple trips.  He moved

cigarettes into New York City that he believed were stolen.  He

moved counterfeit merchandise in.  He drove the cars.  He

talked about using the knowledge he had as a police officer to

help evade law enforcement on those trips.

        He viewed the guns that defendant Masso transported in

the duffel bag, the 20 guns, almost all of which were defaced,

he viewed them before Masso took them in the car, and he drove

one of the other Ryder vans or U-Haul vans that he rented

filled with cigarettes.

        He also participated in the movement of stolen slot

machines both times from Atlantic City into New York.  And,

also, he participated in what he thought was the theft of

cigarettes from the trucks in Virginia, where one of the other

defendants used a bolt cutter to break into tractor trailers.

He helped to load up the cigarettes and he drove one of the

vans again back to New York.

        He was paid $35,000 in total for his role in these

D4idokls

Sentence

offenses.  That is at the top of the amount of money paid out

to the co-conspirators.  I think that does signify his role in

the offenses.

        The government believes a guidelines' sentence here is

appropriate and not greater than necessary.

        THE COURT:  Thank you, Ms. Cohen.

        MR. WEINSTEIN:  Just two very short points, your

Honor.

        THE COURT:  Go ahead, Mr. Weinstein.

        MR. WEINSTEIN:  One, there is no evidence in this

case, and it is reflected by the guilty plea, that Mr. Oklu

knew the guns had defaced serial numbers.  It is an absolute

liability thought crime, but there is certainly that and some

others.

        Other officers participated in many, if not more,

trips, and according -- at least some of them did.  One, for

example, 11 trips.

        And, also, there were discussions by I think it was

Masso and others about evading police by taking I don't know

whether it was the Garden State rather than the New Jersey

Turnpike and others.  He was a police officer and he violated

all of that and so did all the others.  So the only issue is

where within that range of conduct is appropriate to place

Mr. Oklu.

        THE COURT:  As I understand, your client did see the

D4idokls
Sentence

1   guns.

2          MR. WEINSTEIN:  He saw some guns, correct.

3          THE COURT:  All right.  Including an assault weapon.

4          MR. WEINSTEIN:  I thought it was a shotgun but it may

5   have been an assault weapon.

6          THE COURT:  An M-16.

7          MR. WEINSTEIN:  He saw some of the guns, I don't know

8   how many, but so did others.  He is not alone in that and it

9   was --

10          THE COURT:  I understand that.

11          MR. WEINSTEIN:  I am only asking for, you know, for a

12   sentence that would treat him similarly to others who have

13   committed similar acts.  I am not excusing his acts.  I am not

14   justifying them.

15          THE COURT:  All right.  Mr. Weinstein, does your

16   client wish to address the Court before sentence is imposed?

17          MR. WEINSTEIN:  No, your Honor.

18          THE COURT:  Very well.

19          The defendant, Ali Oklu, comes before this Court

20   having pled guilty to two serious crimes against the United

21   States -- a conspiracy to transport firearms and a conspiracy

22   to transport and receive stolen merchandise.

23          This Court has reviewed the presentence investigation

24   report, and as modified on the record here today, I adopt the

25   findings of fact in the report as my own and will cause the

D4idokls
                                 Sentence

1    report to be docketed and filed as part of the record in this

2    case.

3            I will also cause Dr. Escobar's letter to be docketed

4    and filed but placed under seal.

5            Turning first to the guidelines' calculation in this

6    case.

7            With respect to the conspiracy to transport firearms,

8    the base offense level is 12, and four levels are added because

9    of the number of firearms that were transported.  And another

10   four levels are added because a majority of the firearms that

11   were transported had altered or obliterated serial numbers.

12           Further, because Mr. Oklu was a police officer at the

13   time of the offense and used his training and law enforcement

14   knowledge to evade enforcement, an abuse of public trust

15   adjustment is appropriate, for an additional two levels.

16           And so his adjusted offense level on the conspiracy to

17   transport firearms is 22.

18           With respect to the conspiracy to transport and

19   receive stolen property, his base offense level is 6, and

20   because the stolen cigarettes, slot machines and firearms were

21   collectively valued at somewhere between 400,000 and $1

22   million, another 14 levels are warranted.  And here again

23   because he abused a position of public trust, a two-level

24   enhancement is appropriate.  So his adjusted offense level on

25   the second conspiracy is 22.

D4idokls

Sentence

1          Applying the multiple-count adjustment, his combined

2    adjusted offense level is 24.

3          The defendant pled guilty before Magistrate Judge

4    Gorenstein back on December 11, 2012.  I have reviewed the

5    minutes of that plea.  I find that Mr. Oklu's plea was knowing

6    and voluntary and he has accepted responsibility, and,

7    accordingly, I grant him a three-level reduction.

8          And so his total offense level is 21.  His Criminal

9    History Category is a I, because this is his first criminal

10   offense, and that yields a guideline range of 37 to 46 months.

11         Turning to the 3553(a) factors.

12         There is a compelling need for general deterrence

13   here.  There is also a compelling need for specific deterrence.

14   The defendant was brought to the United States by his parents

15   as a young boy.  He became a naturalized U.S. citizen as a

16   young boy.  He enjoyed all the benefits of living and growing

17   up in the United States and getting an education here.  By all

18   accounts from the presentence report, his parents provided a

19   wonderful home for him, including curfews after school to

20   ensure that he was home when he needed to be, and he himself

21   acknowledged to the probation officer that he wished he could

22   go back to those days, because they were happy ones for him.

23         But, Mr. Oklu, can't turn the clock back and you can't

24   undo what you've done.  Perhaps sometime over the balance of

25   your life you'll try to make up for what you've done, but only

D4idokls
Sentence

1   time will tell.

2          These were heinous acts by a police officer.  You've

3   got an education here and an education in law enforcement and

4   police science.  This country has been very good to you and

5   your parents.  And it is remarkable that you would betray all

6   the trust.

7          There doesn't appear to be any compelling circumstance

8   for you to engage in this criminal activity.  You didn't have a

9   sick child at home, like another defendant in this case.  You

10  had virtually no responsibilities.  You were still living as an

11  adult and police officer under your parents' roof.  And you

12  were earning a real good salary for a young man with no

13  financial obligations -- no children to support, no mortgage to

14  pay, but just some student loans.  But for whatever reason, you

15  got involved in this and decided that it was all worth driving

16  around in a Mercedes convertible.

17          Those days are all coming to an end.

18          Police officers perform an honorable public service.

19  Among other things, they parole dangerous neighborhoods and put

20  their lives on the line to protect police officers and the

21  community.  No police officer operates alone; they all rely on

22  their fellow officers as backup, and survive because of the

23  trust they build with them.

24          Your evaluations from your short career with the New

25  York City Police Department describe you as a, quote, solid,

D4idokls
Sentence

1    promising young officer, close quote.  Elsewhere, your

2    supervisor wrote, someone, quote, who behaves to a high ethical

3    standard, close quote.  Boy, did you pull the wool over their

4    eyes because you have been leading a life of a fraud.

5          You were described as an arrest-oriented officer who

6    could quickly identify suspicious or criminal activity and

7    address the situations appropriately.  You had the potential

8    for a bright career.  But you threw it all away.  Instead, you

9    chose to betray your badge and your fellow officers.  You sold

10   your integrity cheaply.  While you were out arresting people

11   for breaking the law, you were committing crime yourself, and

12   the crimes were made all the more serious because you were a

13   cop.

14         And then you agreed to transport stolen firearms in

15   interstate commerce.  You not only betrayed your fellow

16   officers, Mr. Oklu, you placed their lives at risk.  If things

17   had gone according to your plan, three M-16 rifles, a shotgun,

18   and 16 handguns would be out on the streets of our city.  You

19   knew exactly what kind of danger you were unleashing on the

20   community and your fellow officers.  The victims of gun

21   violence are almost never present in these sentencing

22   proceedings.  They're the four-year-old child who was shot to

23   death in the Bronx because they were in the wrong place at the

24   wrong time, or they're cops, like Detective Russel Timoshenko.

25   There are countless other victims and family members who are

D4idokls
Sentence

1   left to deal with the aftermath of gun violence.  But you

2   didn't care about that.  I guess you cared about tooling around

3   in your Mercedes convertible.

4           Your criminal endeavors were not the result of a

5   momentary lapse; you participated in numerous trips to retrieve

6   purportedly stolen slot machines and cigarettes and guns.  And

7   you were involved in the planning stages of these crimes, using

8   your tactical knowledge gained from the Police Department to

9   plan driving routes, explaining how the vehicles should not

10  travel together, and helping to pick out the types of vehicles

11  to be used to best facilitate these crimes.

12          Your participation in these crimes is a disgrace.

13          This Court recognizes the need to avoid unwarranted

14  disparities in sentencing.  This Court observes that, unlike

15  Joseph Trischitta, who was sentenced by this Court, Mr. Oklu

16  has virtually nothing to tilt the balance in his favor about

17  anything.  He has enjoyed a comfortable, selfish life up until

18  this point in time, and it is against this backdrop that the

19  Court is prepared to impose sentence on him and put an end to

20  some of this.

21          So, Mr. Oklu, I would ask you to stand and the Court

22  would impose sentence.

23          Mr. Oklu, in my remarks I've tried to make it clear

24  how I view your conduct in this case.  It is my judgment,

25  Mr. Oklu, that you be sentenced to a term of 46 months of

D4idokls

Sentence

imprisonment to run concurrently on each count, to be followed
by three years of supervised release to run concurrently on
each count.

I'm going to impose a fine on you of $7,500.

I'm going to enter an order of forfeiture in the
amount of $35,000, and I'm going to impose the mandatory $200
special assessment in this case.

With respect to your supervised release, I'm going to
impose all of the standard conditions of supervised release and
the following special conditions:

First, that you submit your person, residence, place
of business, vehicle, or any other premises under your control
to a search on the basis that your probation officer has a
reasonable belief that contraband or other evidence of a
violation of the conditions of your release may be found.  That
search can be conducted at a reasonable time and in a
reasonable manner.  And your failure to submit to such a search
may be grounds for revocation.  And so you are to inform any
other residents of the premises where you reside upon your
release that those premises may be subject to search pursuant
to this condition.

I'm also going to require you to provide your
probation officer with access to any requested financial
information during the period of your supervised release.  You
are not to incur any new credit card charges or open additional

Sentence

 1   lines of credit without the specific approval of your probation

 2   officer during your term of supervised release.  And I'm going

 3   to require you to pay 15 percent of your gross monthly income

 4   toward the fine that I've imposed upon your release.

 5          Because the only sense I can make of your crime is

 6   that you wanted to enjoy the better things in life that you

 7   didn't think you could afford on the very fine salary that you

 8   were receiving with overtime as a police officer.  There are

 9   plenty of people in this city who would welcome the opportunity

10   to have a job that paid what your job paid.

11          Now, this constitutes the sentence of this Court.

12          I advise you that to the extent you have not

13   previously waived your right to appeal, you have the right to

14   appeal.

15          I advise you further that if you cannot afford

16   counsel, counsel will be provided to you free of charge.

17          Mr. Weinstein has represented you admirably in this

18   case and done everything to help someone who seems incapable of

19   helping himself.  I'm confident that he'll advise you further

20   with regard to your appellate rights.

21          You may be seated.

22          Are there any further applications?

23          MS. COHEN:  Your Honor, the government at this time

24   moves to dismiss Count Two of the Information.

25          THE COURT:  The government's application is granted.

D4idokls
Sentence

1        MS. COHEN:  Thank you, your Honor.

2        And the government at this time would just seek a

3   modification of the defendant's bail status.  You know, I

4   understand that the defendant has produced a letter from his

5   doctor regarding problems he has urinating on demand, so to

6   speak.  But given that the letter from the doctor came way

7   after the Court -- after the fact, after the Court inquired,

8   given his financial history, the government believes that it

9   would be appropriate perhaps to impose electronic monitoring

10  pending his surrender date.  And that would also address the

11  defense concern that if he were to surrender here to the MDC or

12  MCC that he would spend his time awaiting transfer to a

13  permanent assignment, that he would be held in the SHU, which

14  the government believes that is what would happen to ensure his

15  own safety, and perhaps a happy medium would be that electronic

16  monitoring be put in place.

17       MR. WEINSTEIN:  Your Honor, the reason the letter was

18  produced as late as it was is because it wasn't an issue until

19  the Court mentioned it.

20       THE COURT:  Probation apparently -- excuse me,

21  Pretrial Services never made it an issue.

22       MR. WEINSTEIN:  Right.

23       THE COURT:  All right?  So I understand that.

24       MR. WEINSTEIN:  OK.  He clearly has never been a

25  flight risk.  He has in no way violated any of his pretrial

D4idokls
Sentence

1    conditions.  He is not going back to Turkey.  He is a U.S.

2    citizen.  His entire family is in the United States.  They are

3    the ones who are on the hook for $100,000 if he were to violate

4    those conditions.

5           And there is absolutely no evidence -- I know the

6    Court had reason to infer based on his failure to void, and

7    maybe there was something, but there is no evidence anywhere

8    that he has ever used drugs.  So, I mean, he has got probably

9    about six weeks before he will -- the typical time it takes for

10   a designation.  I don't think there is any need for more

11   restrictive pretrial conditions.

12          THE COURT:  All right.  I am going to deny the

13   government's application to modify the conditions of his

14   release while he is awaiting designation to a facility.

15          I fully expect that random drug testing, among other

16   things, will continue between now and the time of his surrender

17   to a facility to be designated by the Bureau of Prisons.

18          Mr. Oklu, do you understand that all of the conditions

19   that had previously been imposed on you are going to continue

20   to apply until your surrender?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Very well.

23          I'll require him to surrender to a facility to be

24   designated by the Bureau of Prisons on June 5.

25          MS. COHEN:  Your Honor, just the original bail

D4idokls
                          Sentence

1    condition did not require random drug testing, so I just wanted

2    to be clear that that has been modified.

3              THE COURT:  Then I am modifying the bail conditions to

4    require random drug testing at the discretion of Pretrial.

5              MS. COHEN:  And the government has a consent order of

6    forfeiture for your Honor's signature.

7              THE COURT:  Hand it up and I will sign it.

8              MS. COHEN:  Thank you, your Honor.

9              THE COURT:  Anything further?

10             MS. COHEN:  Not from the government, your Honor.

11             MR. WEINSTEIN:  No, your Honor.

12             THE COURT:  All right.  This matter is concluded.

13             THE CLERK:  All rise.

14

15                              -   -   -

16

17

18

19

20

21

22

23

24

25